**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCTION COMPANY,** | * * * * | |
| **Plaintiffs,** | * | |
| **v.** | * | |
| **MIKAL C. WATTS, WATTS GUERRA LLP, and** | * * * | |
| **BON SECOUR FISHERIES, INC.; FORT MORGAN REALTY, INC.; LFBP #1, LLC d/b/a GW FINS; PANAMA CITY BEACH DOLPHIN TOURS & MORE, LLC; ZEKE'S CHARTER FLEET, LLC; WILLIAM SELLERS; KATHLEEN IRWIN; RONALD LUNDY; CORLISS GALLO; LAKE EUGENIE LAND & DEVELOPMENT, INC.; HENRY HUTTO; BRAD FRILOUX; JERRY J. KEE; JOHN TESVICH; and MICHAEL GUIDRY, on behalf of themselves and all others similarly situated,** | * * * * * * * * * * * * | Civil Case No. _____  Judge _____  Magistrate Judge _____ |
| **Defendants.** | * * | |

---

## COMPLAINT

Plaintiffs BP Exploration & Production Inc., BP America Production Company ("BP"),

as and for their Complaint against defendants Mikal C. Watts; Watts Guerra LLP (collectively,

"Watts" or "Watts Defendants"); and Bon Secour Fisheries, Inc.; Fort Morgan Realty, Inc.;

LFBP #1, LLC D/B/A GW Fins; Panama City Beach Dolphin Tours & More, LLC; Zeke's

Charter Fleet, LLC; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; Lake

Eugenie Land & Development, Inc.; Henry Hutto; Brad Friloux; Jerry J. Kee; John Tesvich; and

Michael Guidry, on behalf of themselves and all others similarly situated (collectively, the "Class"); (collectively, "Defendants"), state and allege as follows:

## PRELIMINARY STATEMENT

1.       This Complaint arises out of and is related to Civil Action No. 12-970 before this Court, captioned *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc. et al.*, which case forms part of Multi-District Litigation Case No. 10-2179 also before this Court, captioned *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "Class Action"), before the Honorable Carl J. Barbier and Magistrate Judge Sally Shushan of this Court.

2.       Specifically, this Complaint relates to the Seafood Compensation Program of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement ("Settlement Agreement"), May 3, 2012, Doc. No. 6430-1.[1]  The Settlement Agreement is attached hereto as Exhibit 1, exclusive of its exhibits.  The Seafood Compensation Program is Exhibit 10 to the Settlement Agreement, which is attached hereto as Exhibit 2.

3.       This Complaint is necessitated by the brazen fraud of attorney Mikal Watts and his law firm, Watts Guerra LLP – fraud that, if not remedied, stands to cost BP substantial sums and to hold the entire Seafood Compensation Program up to public ridicule.  It is not alleged in this Complaint that the Class engaged in any wrongful conduct, only that it unjustly benefited from the wrongdoing of Watts.

4.       In misrepresentations to BP and this Court, Watts and his firm claimed to represent more than 40,000 deckhands who allegedly suffered economic injuries as a result of the Oil Spill – more than 76 percent of the individuals ultimately projected to be potential

---

[1]  All "Doc. No." References refer to the docket entries in Multi-District Litigation Case No. 10-2179.

claimants under the Seafood Compensation Program ("the Program").  Watts' representations caused BP to offer $2.3 billion to establish the Seafood Compensation Program to compensate, *inter alia*, these 40,000-plus deckhands.  But we now know that over half of Watts' alleged clients were phantoms: individuals never represented by Watts, in a number of cases not even commercial fishermen, and in some instances individuals who are deceased.

5.      BP is pursuing two alternative avenues for relief.  In addition to this Complaint, BP has filed a motion in Multi-District Litigation Case No. 10-2179, pursuant to Fed. R. Civ. P. 60(b), asking the Court to grant BP relief from the judgment by reducing the size of the Seafood Compensation Fund ("Seafood Fund") in light of the fact that the judgment was obtained by fraud.  *See* Motion For Relief Pursuant to Rule 60(b)(3), Dec. 17, 2013, MDL No. 2179.  BP is also filing, along with this Complaint, a Motion for a Preliminary Injunction Suspending the Second Distribution of the Seafood Compensation Program, which seeks interim relief while this case remains pending.

## PARTIES

6.      Plaintiff BP Exploration & Production Inc. ("BP Exploration") is a defendant in the Class Action and is a party to the Settlement Agreement.

7.      Plaintiff BP America Production Company ("BP America") is a defendant in the Class Action and is a party to the Settlement Agreement.

8.      Defendant Mikal C. Watts is an attorney with the law firm of Watts Guerra LLP and is a former member of the Plaintiffs' Steering Committee in the Class Action.  He is a resident of San Antonio, Texas.  This Court has personal jurisdiction over Mr. Watts because Mr. Watts has claimed to represent more than 40,000 putative class members in the Class Action litigation before this Court, many of whom were or were alleged to be residents of Louisiana.

3

Mr. Watts otherwise participated in the Class Action litigation before this Court as a member of the Plaintiffs' Steering Committee until his resignation from that committee on March 13, 2013. Mr. Watts consented to the continuing, ongoing, and exclusive jurisdiction of this Court for any suit arising out of or relating to the Settlement Agreement. *See* Ex. 1 § 18.1.

9.      Defendant Watts Guerra LLP ("Watts Guerra"), formerly known as Watts Guerra Craft LLP, is a law firm with its principal office in San Antonio, Texas. At all times relevant to the Complaint, Defendant Mikal Watts has been a capital partner of Watts Guerra and participated in the Class Action litigation under its auspices. This Court has personal jurisdiction over Watts Guerra because the firm and its agents alleged that they represented more than 40,000 claimants in complaints and other documents filed in the Class Action litigation before this Court, and because the firm, through its agents, consented to the continuing, ongoing, and exclusive jurisdiction of this Court for any suit arising out of or relating to the Settlement Agreement. *See* Ex. 1 § 18.1.

10.      The Class is defined in the Settlement Agreement, *see* Ex. 1 §§ 1-2, and was certified for the purpose of settlement pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) by the Court. *See* Order and J. Granting Final Approval of Economic & Property Damages Settlement & Confirming Class Certification of the Economic & Property Damages Settlement Class, Dec. 21, 2012, Doc. No. 8139 ("Approval Order"). As discussed in the Approval Order, the Class numbers in the tens of thousands, making joinder impracticable. The named representatives of the Class include Bon Secour Fisheries, Inc.; Fort Morgan Realty, Inc.; LFBP #1, LLC d/b/a GW Fins; Panama City Beach Dolphin Tours & More, LLC; Zeke's Charter Fleet, LLC; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; Lake Eugenie Land & Development, Inc.; Henry Hutto; Brad Friloux; Jerry J. Kee; John Tesvich; and

4

Michael Guidry.  The claims asserted here against the named defendants, which relate to the validity of the Settlement Agreement, are typical of the claims against the defendant Class, as all are parties to the Settlement Agreement.  This Court found in the Class Action that the named defendants are in a position to fairly and adequately represent the interests of the defendant Class.  Because this action arises out of the Class Action's Settlement Agreement, an action against defendants as a class is superior to the other available methods for the fair and efficient adjudication of this controversy.  The Class, including its named representatives, consented to the continuing, ongoing, and exclusive jurisdiction of this Court for any suit arising out of or relating to the Settlement Agreement.  *See* Ex. 1 § 18.1.

11.     It is not alleged in this Complaint that the Class engaged in any wrongful conduct, only that it unjustly benefited from the wrongdoing of Watts.  Joinder of the Class representatives as parties is also necessary to protect the Class' interest in the Settlement Agreement.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and 28 U.S.C. § 1367 as a related case to the underlying Class Action for Private Economic Losses and Property Damages.  This action forms part of the same case or controversy as the underlying Class Action, inasmuch as it alleges that the Settlement Agreement in the Class Action, which was finally approved by this Court in a final judgment, Doc. No. 8139, was obtained by fraud.

13.     In its final judgment, this Court explicitly retained ongoing and exclusive jurisdiction over the Settlement Agreement and the Seafood Fund until the termination of the Court Supervised Settlement Program by the Court, an event that has not yet come to pass.  *See* Doc. No. 8139; Ex. 1 §§ 4.3.2, 5.12.1.2, 18.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because many of the Class defendants reside in this district, and because many of the events or omissions giving rise to this claim occurred here.  Venue is also appropriate because this Court has retained continuing and exclusive jurisdiction over suits and actions arising out of or related to the Settlement Agreement.  *See* Ex. 1 § 18.1.

## FACTUAL BACKGROUND

15.     Beginning in June 2010, Watts filed at least 25 complaints with this Court that were consolidated with MDL 2179, purportedly on behalf of approximately 40,000 plaintiffs ("the Watts claimants").  *See, e.g.*, First Amended Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, Oct. 19, 2010, Doc. No. 563.  Watts filed the first of these complaints on June 3, 2010.  *See* Compl. by Plaintiffs Tran Ngoc Dung, *et al.*, June 3, 2010, Doc. No. 1-2, *Dung, et al. v. BP Exploration & Prod., Inc., et al.*, No. 2:10-CV-03178 (E.D. La.) (Barbier, J.).

16.     Thereafter, on August 27, 2010, Mikal Watts filed a sworn and notarized application for membership on the Plaintiffs' Steering Committee ("PSC"), claiming that he "ha[d] previously filed multiple civil actions in this litigation and currently represent[ed] over 40,000 plaintiffs."  Mot. to Appoint Counsel Mikal C. Watts to Plaintiffs' Steering Committee at 1, Aug. 27, 2010, Doc. No. 106.

17.     Mikal Watts thus represented to this Court that he had more clients than any other attorney or law firm competing for a place on the Committee.  The Court appointed Mikal Watts to the PSC.  *See* Pretrial Order 8, Oct. 8, 2010, Doc. No. 506; *see also* Pretrial Order 53, Sept. 10, 2012, Doc. No. 7350 (re-appointing the PSC, including Watts).

18.     The Court thereafter adopted a procedure that allowed claimants to join the class action complaint by filing a short-form joinder ("SFJ") rather than filing separate complaints.

Pretrial Order 24, Jan. 12, 2011, Doc. No. 982.  Watts filed over 44,500 SFJs with the Court.

*See* Liaison Counsel Memo., July 6, 2011, Doc. No. 3142 ("Approximately 107,000 short-form

joinders have been entered on the docket, with the Watts Guerra firm accounting for 44,510 of

those filings."), *see also* Civil No. 10-08888, captioned *In re: Oil Spill by the Oil Rig*

*"Deepwater Horizon" SHORT-FORM JOINDERS.*[2]

19.    Of the 44,500-plus Watts SFJs, 42,722 were allegedly on behalf of individual

seafood crew claimants.  *See* Opt-Out Letter at 2 (listing 42,722 "Watts Individual/Crew Fishing

SFJs"), attached hereto as Exhibit 3.[3]

20.    Only 5,998 other SFJs had been filed by other representatives on behalf of

individual seafood crew claimants.  *See id.*  Thus, Watts filed 88 percent of the individual

seafood crew claim SFJs.  *See id.*

21.    Each SFJ filed by Watts contained the name of the alleged client, an identification

number assigned by Watts ("Watts ID"), and the last four digits of the alleged client's Social

Security number ("SSN").  Although Mikal Watts resigned from his position as a member of the

PSC on March 13, 2013, *see* Order, Doc. No. 8894, he did not withdraw from his

"representation" of these alleged clients.[4]

---

[2]  *See* Civil No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and 47801–52221 (the vast majority of the SFJs filed in these docket ranges were filed by Mikal Watts).

[3]  This publicly accessible version of the Opt-Out Letter embodies the terms of the Opt-Out Letter submitted jointly by BP and the PSC to the Court on April 17, 2012.  BP refers to this publicly accessible version only because the official letter was filed under seal and is not reflected in any docket entry in MDL 2179.  *See* http://www.deepwaterhorizoneconomic settlement.com/docs/Seafood_Opt-Out_Terms.pdf (last visited Dec. 16, 2013).

[4]  Watts did withdraw from the representation of 142 plaintiffs in a series of filings on July 25, 2011.  *See* Doc. Nos. 3424–3444.  He did not, however, withdraw from his alleged representation of the remaining plaintiffs, who still numbered in excess of 40,000.  Recently, in September 2013, Watts filed dismissal forms for approximately 207 claims.  *See* Civil No. 10-08888, Doc. Nos.136026–136233.

22.     BP and the PSC initiated global settlement discussions in spring 2011.

# REDACTED

27.     Representatives of BP were present during these negotiations, including Mark

Holstein, BP's Managing Counsel for Deepwater Horizon Claims, and James Neath, BP's

Associate General Counsel.

---

[5] Although BP does not believe punitive damages would have been applicable in this case, it recognizes that the Court ruled that punitive damages were available for general maritime law claimants.  *See* Order and Reasons, Aug. 26, 2011, Doc. No. 3830.

28.     BP was also represented by outside counsel – primarily Richard Godfrey and Wendy Bloom of Kirkland & Ellis.

29.     The Class was represented during the negotiations primarily by Joseph Rice and Calvin Fayard, members of the PSC.

REDACTED

34.     The end result was the Seafood Compensation Program, Exhibit 10 to the final Settlement Agreement submitted to the Court for approval in May 2012.  *See* Exs. 1, 2.

35.     The Seafood Compensation Program contemplated two major distributions.  In the first round, the Court Supervised Settlement Program would review all claims, determine their validity, and pay out compensatory awards.  Regarding the first distribution, the parties "estimated [it] to result in prompt claims payments totaling more than $1.9 billion."  Ex. 2 at 3. The second round of distributions would occur only "[i]n the event there are Seafood Compensation Program Amount funds remaining."  *Id.*  The Program would distribute any such funds "to claimants that received compensation from the Seafood Compensation Program" in the first round "in proportion to the Claimant's gross compensation expressed as a share of the gross compensation paid by the Claims Administrator to all claimants under the Seafood Compensation Program," or by a distribution that the Seafood Neutral determines "would be more appropriate in light of the information available at the time of the second distribution," subject to this Court's approval.  *Id.*  Thus, the Court continues to supervise the distribution of the Seafood Fund.

36.     If there is money left in the Seafood Fund after the first round of distributions, then, this settlement structure provides a premium to those claimants who received compensation in the first distribution.  But if the number of legitimate claimants is unexpectedly small, then the structure provides, not a premium, but a windfall to the claimants who received compensation in the first round.

37.     The opt-out feature of the settlement reduces the potential for such a windfall. *See* Ex. 1 § 8.2; Ex. 3.  The opt-out terms provide for a credit against the $2.3 billion fund for monies that BP was required to pay to individual seafood crew class members who chose not to participate in the Seafood Compensation Program, and instead opted out, above a certain threshold.  In connection with this opt-out provision, the parties attached a chart which identified the "Number of Potential Claimants in Gulf Fishing Industry."  It added the number of "Watts Individual/Crew Fishing SFJs" (42,722) to the number of "Non-Watts Individual/Crew Fishing SFJs" (5,998), and added an additional 7,000 "Assumed New Individual/Crew Fishing SFJs" to reach a total of 55,720 "Total Crew Claimants."  Ex. 3 at 2.

38.     Had 42,000 claimants from the list of "Watts Individual/Crew Fishing SFJs" opted out, BP would have received back a substantial portion of the $2.3 billion it paid into the Seafood Fund.  But, of course, virtually none of Watts' phantom claimants and "clients" who are not really clients have opted out.  *See* Ex. 1 § 8.2.1 (the procedure for properly opting out of the Settlement Agreement requires a class member to submit a written request to opt out, which must be signed by the natural person or entity seeking to opt out, and cannot be signed by the class member's attorney); Order, Aug. 27, 2012, Doc. No. 7176 (setting November 1, 2012 as the deadline to opt out).  In fact, Watts filed only a very small number of opt outs.

39.     In this way, Watts' claim that he represented more than 40,000 claimants, including his filing of SFJs far in excess of that number of claimants, inflated the value of the Seafood Compensation Program to $2.3 billion.  But when fewer than 1,000 persons from that group filed claims, and the other 42,000 Watts "clients" did not opt out, Watts' phantom clients created an unjustifiable, fraud-based windfall for the first-round claimants.

**Claims Filed in the Seafood Compensation Program**

40.     To date, there have been only 24,520 Seafood Compensation Program claims

filed.  Of these, 4,491 were individual seafood crew member claims.  The Seafood Fund has

distributed $1.05 billion of the $2.3 billion in the first round, not $1.9 billion.

41.     Watts ultimately filed only 648 individual crew claims under the Seafood

Compensation Program – less than 2 percent of the number of crew claimants he purported to

represent.  Of those 648 claimants, only 8 have been found eligible for payment, with 17 claims

still pending and available for possible compensation.  In short, more than 98 percent of the

Watts claimants never even filed a claim with the Seafood Compensation Program, while 96

percent of the claims that he did file have been denied.  The deadline for filing claims has passed.

42.     But in January 2013, Watts filed 43,976 claims with the BP Claims Program

("BPCP").  The BPCP is a program set up to address the claims of individuals and businesses

who are excluded from the Settlement Agreement, or have validly exercised their legal right to

opt out of the Settlement Agreement, or wish to pursue claims that are expressly reserved to

them pursuant to the Settlement Agreement.

43.     Virtually all of the Watts claims submitted to the BPCP corresponded to the SFJs

filed with the Court.  As purported members of the Class, it is unclear on what basis Watts filed

these claims with the BPCP, particularly because Watts only filed a very small number of opt

outs.

44.     The BPCP claims purported to include full Social Security numbers for each

claimant.  When the BPCP sought to verify these SSNs pursuant to its customary claims-

processing procedures, it could confirm the identity of only 42 percent of the Watts claimants.[6]

Of the remaining SSNs, 40 percent belong to a living person other than the named claimant, 5

percent belong to a dead person other than the named claimant, and 13 percent are incomplete or

"dummy" SSNs (*e.g.*, 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).

     45.    While attempting to verify the identities of these claimants, the BPCP discovered

that one of its own employees – who was not a commercial fisherman, had never retained Watts

as counsel, and had never filed a claim – had been included among Watts' client list not once,

but twice.  His first "claim" included his name, current address, a defunct phone number, and a

wholly incorrect SSN.  His second "claim" included his name, his parents' address, his parents'

phone number, and a different, incorrect SSN.

     46.    It is bad enough that Watts filed fraudulent SFJs and BPCP claims for at least 58

percent of the claimants.  But, even among the 42 percent of claims with matched names and

SSNs, ***more than 95 percent*** never filed a claim with the Program.  The inference of fraud is

overwhelming.

     47.    The Watts Defendants knew that their representations regarding the number of

individual clients claiming seafood-industry losses were false, as over half of their alleged

seafood claimants are phantoms or are the victims of identity theft, and as more than 95 percent

never filed a claim with the Program.  The Watts Defendants had an insufficient basis to make

these representations to BP and the Court, in light of the fact that the identities of a majority of

these alleged claimants were unverified, and appear to be unverifiable.

     48.    There apparently is an investigation by the United States Department of Justice.

According to several news reports, in February 2013, the Secret Service executed search

---

[6]  This is not to say that those claimants recovered, but rather simply that those claimants had a
valid SSN that matched their name or other identifying information.

warrants at Watts' two law offices in San Antonio, Texas.  Per the reports, the searches were the result of a "federal investigation over the legitimacy of his client list in a case stemming from the deadly 2010 BP oil spill."  Watts resigned from the PSC shortly after these searches, and the Court ordered his removal.  *See* Doc. No. 8894.

REDACTED

## CAUSES OF ACTION

### COUNT I: FRAUDULENT MISREPRESENTATION
**(Federal Common Law)**
**(Against all Defendants)**

49.     BP re-alleges and incorporates by reference paragraphs 1 through 48, *supra*, as though fully set forth herein.

50.     Watts misrepresented, suppressed, or omitted true information in:

a.  At least 25 complaints filed between June 3, 2010 and October 4, 2010 that were consolidated into the MDL before this Court, purportedly on behalf of approximately 40,000 individual plaintiffs, listing Mikal Watts as the "Attorney in Charge," *see, e.g.*, Doc. No. 563;

b.  Mikal Watts' sworn and notarized application for membership on the PSC, claiming that he "currently represent[ed] over 40,000 plaintiffs," on August 27, 2010, *see* Doc. No. 106; and

c.  More than 40,000 SFJs filed with this Court in March and April 2011, asserting alleged individual Seafood Compensation Program claims, despite the fact that Watts did not truly represent over 40,000 individual persons; rather, more than half of his alleged clients were phantoms. *See, e.g.*, Civil No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and 47801–52221; *see also* Ex. 3 at 2 (listing 42,722 "Watts Individual/ Crew Fishing SFJs").

51.     The misrepresentation regarding the number of Watts' alleged individual seafood clients was incorporated into the Settlement Agreement via the Opt-Out Letter.  The Opt-Out Letter asserts that the "Number of Potential Claimants in the Gulf Fishing Industry" included

15

42,722 "Watts Individual/Crew Fishing SFJs," 5,998 "Non-Watts Individual/Crew Fishing SFJs," and 7,000 "Assumed New Individual/Crew Fishing SFJs" for a total of 55,720 "Crew Claimants."  Thus, the Settlement Agreement reflects that the Watts claimants constituted 88 percent of the individual crew SFJs on record and more than 76 percent of the individuals projected to be potential crew claimants under the Seafood Compensation Program.  The number of Watts claimants listed in the Opt-Out Letter was false.

# REDACTED

53.     The Watts Defendants knew that their representations regarding their number of individual clients claiming seafood-industry losses were false, as over half of their alleged seafood claimants are phantoms or are the victims of identity theft, and as more than 95 percent never filed a claim with the Program.  The Watts Defendants had an insufficient basis to make these representations to BP and the Court, in light of the fact that the identities of a majority of these alleged claimants were unverified, and appear to be unverifiable.  Watts had a substantial incentive to defraud both BP and the Court: by exaggerating the number of clients he represented, he was able to place himself on the PSC, which entitled him to considerable legal fees.

54.     The Watts Defendants intended to induce BP to act in reliance on their representations as to the number of their seafood claimants, and to cause damage to BP, by

obtaining BP's agreement to pay $2.3 billion into the Seafood Fund to settle tens of thousands of individual claims that did not exist.

# REDACTED

55.     The Watts Defendants' misrepresentations, suppressions, and omissions substantially influenced BP's agreement to the terms of the Settlement Agreement.  BP reasonably and justifiably relied, to its detriment, upon the misrepresentations and omissions of the Watts Defendants.

56.     The Class benefited from Watts' misrepresentations, as the misrepresentations convinced BP to overfund the capped Seafood Fund.  If a second distribution from the Seafood Compensation Program is made, the Class will profit from the fraudulent and illegal conduct of Watts by obtaining a fraud-based windfall payment which it is not just, equitable, or conscionable for them to retain.

57.     WHEREFORE, BP is entitled to rescission or reformation of the Settlement Agreement with respect to the Seafood Compensation Program, or in the alternative, BP is entitled to an award of damages in an amount to be proved at trial; as well as reimbursement of costs and expenses of maintaining this action; and an award of such other and further relief as this Court may deem just and proper.

**COUNT II: RESCISSION AND/OR REFORMATION OF CONTRACT BASED UPON
FRAUD AND/OR ERROR
(La. Civ. Code arts. 1948 - 1958)
(Against all Defendants)**

58.     BP re-alleges and incorporates by reference paragraphs 1 through 57, *supra*, as though fully set forth herein.

59.     Watts misrepresented, suppressed, or omitted true information in:

a.  At least 25 complaints filed between June 3, 2010 and October 4, 2010 that were consolidated into the MDL before this Court, purportedly on behalf of approximately 40,000 individual plaintiffs, listing Mikal Watts as the "Attorney in Charge," *see, e.g.*, Doc. No. 563;

b.  Mikal Watts' sworn and notarized application for membership on the PSC, claiming that he "currently represent[ed] over 40,000 plaintiffs," on August 27, 2010, *see* Doc. No. 106; and

c.  More than 40,000 SFJs filed with this Court in March and April 2011, asserting alleged individual Seafood Compensation Program claims, despite the fact that Watts did not truly represent over 40,000 individual persons; rather, more than half of his alleged clients were phantoms. *See, e.g.*, Civil No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and 47801–52221; *see also* Ex. 3 at 2 (listing 42,722 "Watts Individual/ Crew Fishing SFJs").

60.     The misrepresentation regarding the number of Watts' alleged individual seafood clients was incorporated into the Settlement Agreement via the Opt-Out Letter.  The Opt-Out Letter asserts that the "Number of Potential Claimants in the Gulf Fishing Industry" included 42,722 "Watts Individual/Crew Fishing SFJs," 5,998 "Non-Watts Individual/Crew Fishing SFJs," and 7,000 "Assumed New Individual/Crew Fishing SFJs" for a total of 55,720 "Crew Claimants."  Thus, the Settlement Agreement reflects that the Watts claimants constituted 88 percent of the individual crew SFJs on record and more than 76 percent of the individuals

projected to be potential crew claimants under the Seafood Compensation Program.  The number of Watts claimants listed in the Opt-Out Letter was false.

# REDACTED

62.     The Watts Defendants intended to obtain an unjust advantage over BP, and to cause damage to BP.

# REDACTED

63.     The Watts Defendants' misrepresentations, suppressions, and omissions substantially influenced BP's agreement to the terms of the Settlement Agreement.  BP reasonably relied, to its detriment, upon the misrepresentations and omissions of the Watts Defendants.  BP would have been in a significantly different position had it known the true facts.

64.     The Class benefited from Watts' misrepresentations, as the misrepresentations convinced BP to overfund the capped Seafood Fund.  If a second distribution from the Seafood Compensation Program is made, the Class will profit from the fraudulent and illegal conduct of Watts by obtaining a fraud-based windfall payment which it is not just, equitable, or conscionable for them to retain.

65.     WHEREFORE, BP is entitled to rescission or reformation of the Settlement

Agreement with respect to the Seafood Compensation Program, or in the alternative, BP is

entitled to an award of damages in an amount to be proved at trial; as well as reimbursement of

costs and expenses of maintaining this action; and an award of such other and further relief as

this Court may deem just and proper.

### COUNT III: DELICTUAL FRAUD/INTENTIONAL MISREPRESENTATION
(La. Civ. Code art. 2315)
(Against Watts Defendants)

66.     BP re-alleges and incorporates by reference paragraphs 1 through 65, *supra*, as

though fully set forth herein.

67.     The Watts Defendants made material misrepresentations in:

a.   At least 25 complaints filed between June 3, 2010 and October 4, 2010 that
were consolidated into the MDL before this Court, purportedly on behalf of
approximately 40,000 individual plaintiffs, listing Mikal Watts as the
"Attorney in Charge," *see, e.g.*, Doc. No. 563;

b.   Mikal Watts' sworn and notarized application for membership on the PSC,
claiming that he "currently represent[ed] over 40,000 plaintiffs," on August
27, 2010, *see* Doc. No. 106; and

c.   More than 40,000 SFJs filed with this Court in March and April 2011,
asserting alleged individual Seafood Compensation Program claims, despite
the fact that Watts did not truly represent over 40,000 individual persons;
rather, more than half of his alleged clients were phantoms. *See, e.g.*, Civil
No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and

47801–52221; *see also* Ex. 3 at 2 (listing 42,722 "Watts Individual/ Crew Fishing SFJs").

68.     The misrepresentation regarding the number of Watts' alleged individual seafood clients was incorporated into the Settlement Agreement via the Opt-Out Letter.  The Opt-Out Letter asserts that the "Number of Potential Claimants in the Gulf Fishing Industry" included 42,722 "Watts Individual/Crew Fishing SFJs," 5,998 "Non-Watts Individual/Crew Fishing SFJs," and 7,000 "Assumed New Individual/Crew Fishing SFJs" for a total of 55,720 "Crew Claimants."  Thus, the Settlement Agreement reflects that the Watts claimants constituted 88 percent of the individual crew SFJs on record and more than 76 percent of the individuals projected to be potential crew claimants under the Seafood Compensation Program.  The number of Watts claimants listed in the Opt-Out Letter was false, and the Watts Defendants took no action to correct or clarify the misrepresentations.

# REDACTED

70.     Watts' misrepresentations were material and were intended to obtain an unjust advantage and/or to cause BP a loss.  BP would have been in a significantly different position had it known the true facts – that Mikal Watts had lied when he claimed that he and his law firm represented more than 40,000 individual seafood crew claimants.  The purported existence of approximately 50,000 individual seafood crew claimants – the vast majority of whom were

represented by Watts – influenced BP to enter a global settlement that would resolve individual claims for which BP faced potential additional damage liability.

71.     The Watts Defendants made these misrepresentations with the intent to deceive BP to pay substantially more money into the Seafood Fund than was warranted under the true facts.

# REDACTED

72.     BP justifiably relied on the Watts Defendants' misrepresentations that Mr. Watts represented over 40,000 individual seafood claimants, which were made not only to BP, but were also made repeatedly to the Court.

73.     As a result of BP's reasonable reliance, BP was damaged, for it paid $2.3 billion to establish a dedicated Seafood Fund to cover tens of thousands of individual claims that did not exist.  Indeed had Watts' clients actually existed and opted out of the Seafood Compensation Program, BP's $2.3 billion payment would have been reduced according to the Opt-Out Letter. Not surprisingly then, although the parties contemplated a surplus of only $400 million after the Seafood Compensation Program's first distribution, approximately $1.3 billion remains in the fund instead.

74.     WHEREFORE, BP is entitled to an award of damages in an amount to be proved at trial.

**COUNT IV: NEGLIGENT MISREPRESENTATION**
**(Federal Common Law)**
**(Against Watts Defendants)**

75.     BP re-alleges and incorporates by reference paragraphs 1 through 74, *supra*, as though fully set forth herein.

76.     The Watts Defendants owed BP a duty of care to supply correct information and not intentionally or negligently mislead BP.

77.     The Watts Defendants failed to exercise reasonable care in obtaining and communicating the information regarding his alleged clients.

78.     The Watts Defendants, in the course of their profession, breached this duty by supplying false information for BP's guidance in a transaction in:

     a.  At least 25 complaints filed between June 3, 2010 and October 4, 2010 that were consolidated into the MDL before this Court, purportedly on behalf of approximately 40,000 individual plaintiffs, listing Mikal Watts as the "Attorney in Charge," *see, e.g.*, Doc. No. 563;

     b.  Mikal Watts' sworn and notarized application for membership on the PSC, claiming that he "currently represent[ed] over 40,000 plaintiffs," on August 27, 2010, *see* Doc. No. 106; and

     c.  More than 40,000 SFJs filed with this Court in March and April 2011, asserting alleged individual Seafood Compensation Program claims, despite the fact that Watts did not truly represent over 40,000 individual persons; rather, more than half of his alleged clients were phantoms.  *See, e.g.*, Civil No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and

23

47801–52221; *see also* Ex. 3 at 2 (listing 42,722 "Watts Individual/ Crew Fishing SFJs").

79.     The misrepresentation regarding the number of Watts' alleged individual seafood clients was incorporated into the Settlement Agreement via the Opt-Out Letter.  The Opt-Out Letter asserts that the "Number of Potential Claimants in the Gulf Fishing Industry" included 42,722 "Watts Individual/Crew Fishing SFJs," 5,998 "Non-Watts Individual/Crew Fishing SFJs," and 7,000 "Assumed New Individual/Crew Fishing SFJs" for a total of 55,720 "Crew Claimants."  Thus, the Settlement Agreement reflects that the Watts claimants constituted 88 percent of the individual crew SFJs on record and more than 76 percent of the individuals projected to be potential crew claimants under the Seafood Compensation Program.  The number of Watts claimants listed in the Opt-Out Letter was false.

# REDACTED

81.     Watts' misrepresentations were material.  BP would have been in a significantly different position had it known the true facts – that Mikal Watts had lied when he claimed that he and his law firm represented more than 40,000 individual seafood crew claimants.  The purported existence of more than 50,000 individual crew seafood claimants – the vast majority of whom were represented by Watts – influenced BP to enter a global settlement that would resolve

tens of thousands of individual claims for which BP faced potential additional damage liability. In fact, these claims did not exist.

82.     BP reasonably relied on the Watts Defendants' misrepresentations that Mr. Watts represented over 40,000 individual seafood claimants, which were made not only to BP, but were also made repeatedly to the Court.

83.     As a result of BP's reasonable reliance, BP was damaged, for it paid $2.3 billion to establish a dedicated Seafood Fund to cover tens of thousands of individual claims that did not exist.  Indeed had Watts' clients actually existed and opted out of the Seafood Compensation Program, BP's $2.3 billion payment would have been reduced according to the Opt-Out Letter. Not surprisingly then, although the parties contemplated a surplus of only $400 million after the Seafood Compensation Program's first distribution, approximately $1.3 billion remains in the fund instead.

84.     WHEREFORE, BP is entitled to an award of damages in an amount to be proved at trial.

### COUNT V: NEGLIGENT MISREPRESENTATION
### (La. Civ. Code art. 2315)
### (Against Watts Defendants)

85.     BP re-alleges and incorporates by reference paragraphs 1 through 84, *supra*, as though fully set forth herein.

86.     The Watts Defendants owed BP a duty of care to supply correct information and not intentionally or negligently mislead BP.

87.     The Watts Defendants breached this duty by making affirmative material misrepresentations in:

    a.   At least 25 complaints filed between June 3, 2010 and October 4, 2010 that were consolidated into the MDL before this Court, purportedly on behalf of approximately 40,000 individual plaintiffs, listing Mikal Watts as the "Attorney in Charge," *see, e.g.*, Doc. No. 563;

    b.   Mikal Watts' sworn and notarized application for membership on the PSC, claiming that he "currently represent[ed] over 40,000 plaintiffs," on August 27, 2010, *see* Doc. No. 106; and

    c.   More than 40,000 SFJs filed with this Court in March and April 2011, asserting alleged individual Seafood Compensation Program claims, despite the fact that Watts did not truly represent over 40,000 individual persons; rather, more than half of his alleged clients were phantoms. *See, e.g.*, Civil No. 10-08888, Doc. Nos. 676–40856, 40936–42457, 44311–46801, and 47801–52221; *see also* Ex. 3 at 2 (listing 42,722 "Watts Individual/ Crew Fishing SFJs").

88.    The misrepresentation regarding the number of Watts' alleged individual seafood clients was incorporated into the Settlement Agreement via the Opt-Out Letter.  The Opt-Out Letter asserts that the "Number of Potential Claimants in the Gulf Fishing Industry" included 42,722 "Watts Individual/Crew Fishing SFJs," 5,998 "Non-Watts Individual/Crew Fishing SFJs," and 7,000 "Assumed New Individual/Crew Fishing SFJs" for a total of 55,720 "Crew Claimants."  Thus, the Settlement Agreement reflects that the Watts claimants constituted 88 percent of the individual crew SFJs on record and more than 76 percent of the individuals projected to be potential crew claimants under the Seafood Compensation Program.  The number of Watts claimants listed in the Opt-Out Letter was false.

# REDACTED

90.    Watts' misrepresentations were material.  BP would have been in a significantly different position had it known the true facts – that Mikal Watts had lied when he claimed that he and his law firm represented more than 40,000 individual seafood crew claimants.  The purported existence of more than 50,000 individual seafood crew claimants – the vast majority of whom were represented by Watts – influenced BP to enter a global settlement that would resolve individual claims for which BP faced potential additional damage liability.

91.    BP reasonably relied on the Watts Defendants' misrepresentations that Mr. Watts represented over 40,000 individual seafood claimants, which were made not only to BP, but were also made repeatedly to the Court.

92.    As a result of BP's reasonable reliance, BP was damaged, for it paid $2.3 billion to establish a dedicated Seafood Fund to cover tens of thousands of individual claims that did not exist.  Indeed had Watts' clients actually existed and opted out of the Seafood Compensation Program, BP's $2.3 billion payment would have been reduced according to the Opt-Out Letter.  Not surprisingly then, although the parties contemplated a surplus of only $400 million after the Seafood Compensation Program's first distribution, approximately $1.3 billion remains in the fund instead.

93.    WHEREFORE, BP is entitled to an award of damages in an amount to be proved at trial.

## COUNT VI: DECLARATORY JUDGMENT/
## UNJUST ENRICHMENT
## (28 U.S.C. § 2201/Federal Common Law)
## (Against all Defendants)

94.    BP re-alleges and incorporate by reference paragraphs 1 through 93, *supra*, as though fully set forth herein.

95.    BP has made a payment of $2.3 billion into the Court-supervised Seafood Fund for distribution to eligible Class members.

96.    Because the vast majority of the Watts claimants do not exist, BP had no obligation to pay for those claims and did not owe the money it paid for them to the Seafood Fund or Class.

97.    If a second distribution from the Seafood Compensation Program is made, the Class will be unjustly enriched by the fraudulent and illegal conduct of Watts by obtaining an unjustifiable, fraud-based windfall payment from the Seafood Compensation Program's second distribution under circumstances in which it is not just, equitable, or conscionable for them to retain those funds.

98.    WHEREFORE, the Court should issue a declaratory judgment that BP is entitled to the return of the excess funds deposited by BP into the Seafood Fund as a result of Watts' misrepresentations in an amount to be determined, or an award of such other and further relief as this Court may deem just and proper.

## COUNT VII: DECLARATORY JUDGMENT/
## PAYMENT OF A THING NOT DUE
### (28 U.S.C. § 2201/La. Civ. Code art. 2299)
### (Against all Defendants)

99.     BP re-alleges and incorporates by reference paragraphs 1 through 98, *supra*, as though fully set forth herein.

100.    BP has made a payment of $2.3 billion into the Court-supervised Seafood Fund for distribution to eligible Class members.

101.    Because the vast majority of the Watts claimants do not exist, BP had no obligation to pay for those claims, and BP never consented to paying monies to settle nonexistent claims.  However, as a result of the Watts Defendants' misrepresentations, BP overpaid the Settlement Fund by including monies to resolve "claims" that did not, in fact, exist.

102.    BP has already paid the Seafood Fund monies that were not due.  The second distribution to the Class from the Seafood Fund would constitute further payment of a thing not due.

103.    WHEREFORE, the Court should issue a declaratory judgment that BP is entitled to the return of the excess funds deposited by BP into the Seafood Fund as a result of Watts' misrepresentations in an amount to be determined, or an award of such other and further relief as this Court may deem just and proper.

## COUNT VIII:  ABUSE OF PROCESS
### (La. Civ. Code art. 2315)
### (Against Watts Defendants)

104.    BP re-alleges and incorporate by reference paragraphs 1 through 103, *supra*, as though fully set forth herein

105.    The Watts Defendants had an ulterior purpose for filing tens of thousands of false SFJs on this Court's docket, to wit, they sought to improperly inflate the settlement value of the Seafood Compensation Program, and to thereby profit financially through legal fees.

106.    By filing tens of thousands of SFJs for claimants who did not exist, the Watts Defendants took advantage of this Court's procedure for allowing claimants to join the class action complaint in a way that was fundamentally illegal and illegitimate.

107.    The foregoing misrepresentations, omissions, and misconduct constitutes abuse of process by the Watts Defendants.  BP has incurred damages and unnecessary attorneys' fees as a result of the Watts Defendants' abuse of process for which they are liable.

108.    WHEREFORE, BP is entitled to an award of damages in an amount to be proved at trial, as well as reimbursement of costs and expenses of maintaining this action.

## JURY DEMAND

109.    Plaintiffs demand a trial by jury on all claims triable to a jury.

## PRAYER FOR RELIEF

110.    WHEREFORE, Plaintiffs respectfully request that the Court enter a preliminary injunction preventing the second distribution while this matter remains pending, and a judgment granting:

    a.  Rescission or reformation of the Settlement Agreement;

    b.  an award of damages in an amount to be proved at trial;

    c.  a permanent injunction enjoining that portion of the second distribution proven to be related to the fraud, and ordering that said monies be returned to BP;

30

d.   a declaratory judgment that BP is entitled to the return of the excess funds

deposited by BP into the Seafood Fund as a result of Watts'

misrepresentations in an amount to be determined;

e.   reimbursement of costs and expenses of maintaining this action, including

reasonable attorneys' and expert fees; and

f.   an award of such other and further relief as this Court may deem just and

proper.

December 17, 2013

Respectfully submitted,

  _/s/ Kevin M. Downey_

James J. Neath                              Kevin M. Downey
Mark Holstein                               F. Lane Heard III
BP AMERICA INC.                             Margaret A. Keeley
501 Westlake Park Boulevard                 WILLIAMS & CONNOLLY LLP
Houston, TX  77079                          725 Twelfth Street, N.W.
Telephone:  (281) 366-2000                  Washington, D.C. 20005
Telefax:  (312) 862-2200                    Telephone:  (202) 434-5000
                                            Telefax:  (202) 434-5029

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

Jeffrey Lennard
Keith Moskowitz
DENTONS US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

*OF COUNSEL*

    */s/ Don K. Haycraft*
S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
David J. Zott, P.C.
Jeffrey J. Zeiger
Wendy L. Bloom
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**PLEASE ISSUE SUMMONS TO:**

1.     MIKAL C. WATTS
       4 Dominion Drive, Bldg. 3, Suite 100
       San Antonio, TX, 78257

2.     WATTS GUERRA LLP, c/o
       Mikal C. Watts
       Watts Guerra LLP
       4 Dominion Drive, Bldg. 3, Suite 100
       San Antonio, TX, 78257

3.     BON SECOUR FISHERIES, INC, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

4.     FORT MORGAN REALTY, INC, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

5.     LFBP #1, LLC d/b/a GW FINS, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

6.     PANAMA CITY BEACH DOLPHIN TOURS & MORE, LLC, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

7.     ZEKE'S CHARTER FLEET, LLC, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

8.     WILLIAM SELLERS, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

9.     KATHLEEN IRWIN, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

10.    RONALD LUNDY, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

11.    CORLISS GALLO, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

12.    LAKE EUGENIE LAND & DEVELOPMENT, INC., c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

13.    HENRY HUTTO, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards
       P. O. Box 3668
       556 Jefferson St.
       Lafayette, LA 70502-3668

14.    BRAD FRILOUX, c/o
       James P. Roy (Co-lead class counsel)
       Domengeaux, Wright, Roy & Edwards

P. O. Box 3668
556 Jefferson St.
Lafayette, LA 70502-3668

15.  JERRY J. KEE, c/o
James P. Roy (Co-lead class counsel)
Domengeaux, Wright, Roy & Edwards
P. O. Box 3668
556 Jefferson St.
Lafayette, LA 70502-3668

16.  JOHN TESVICH, c/o
James P. Roy (Co-lead class counsel)
Domengeaux, Wright, Roy & Edwards
P. O. Box 3668
556 Jefferson St.
Lafayette, LA 70502-3668

17.  MICHAEL GUIDRY, c/o
James P. Roy (Co-lead class counsel)
Domengeaux, Wright, Roy & Edwards
P. O. Box 3668
556 Jefferson St.
Lafayette, LA 70502-3668